Benjamin Edward **SCHREIBER**, Petitioner,

v.

John **AULT**, Warden, Iowa State Penitentiary, Respondent.

No. 4:04 CV 40295 JEG.

United States District Court, S.D. Iowa, Central Division.

March 8, 2006.

Richard R. Hollis, Des Moines, IA, for Petitioner.

Thomas William Andrews, Iowa Department of Justice, Des Moines, IA, for Respondent.

### RULING AND ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS

GRITZNER, District Judge.

Petitioner Benjamin Schreiber brings this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The Court has considered Petitioner's and Respondent's briefs on the merits. For the reasons articulated below, the Court must deny Schreiber's petition for a writ of habeas corpus.

### SUMMARY OF MATERIAL FACTS

The Iowa Court of Appeals described Schreiber's crime and the circumstances surrounding it as follows:

On July 27, 1996, John Terry was beaten to death with an ax handle. Earlier in the evening, Schreiber, Terry, and Evelyn Tangie (Terry's girlfriend) drank together at Mary Gerlich's house. The group left the house together in Schreiber's car, and several hours later Schreiber and Tangie returned without Terry. The two were wearing different clothes, and both had wet hair. They refused to respond to repeated questions about Terry's whereabouts. Schreiber made statements that he had "beaten the crap out of John Terry" and "Evelyn Tangie's boyfriend would not be hurting anyone else." Terry's body was found the next morning in a field near an unoccupied trailer in rural Wapello County.

A witness saw a wooden ax handle in Schreiber's car the day before Terry was murdered. The same morning Terry's body was found, a rural resident of Agency, Iowa, noticed a large pickax handle with reddish-brown spots on it lying by the edge of the pavement as he retrieved his Sunday paper. The wooden handle was tested and determined to contain blood matching Terry's. Schreiber had told a friend that someone had been beaten and stated, "I beat him with an ax handle." When [Iowa Department of Criminal Investigations ("DCI")] agents arrested Schreiber and told him they knew he killed John Ter-

ry, Schreiber replied, "I guess Evelyn told you."

Schreiber v. State, 2004 WL 148513, at *1 (Iowa App.2004).

Schreiber was charged with Terry's murder on July 31, 1996.[1] H. Michael Neary was appointed as Schreiber's attorney and asked Kirk Daily[2] to assist with the defense. Daily and Neary filed appearances August 1, and August 2, 1996, respectively. Vicki Siegel, an attorney from the Wapello County Attorney's office, and Doug Hammerand, an attorney from the Iowa Attorney General's office, prosecuted Schreiber.

On September 12, 1996, Schreiber wrote District Judge Morrison addressing Schreiber's concerns that somebody had broken into his home and asking the court to help him protect his home. This began a litany of pro se filings by Schreiber which tend to show he was able, and quick, to use the channels of the criminal justice system to object when he felt his rights were being infringed.

Before Schreiber's murder trial began, but while Daily was acting as his attorney, Daily accepted Vicki Siegel, the County Attorney prosecuting Schreiber, as a client. Daily represented Siegel in connection with conflict of interest charges leveled at Siegel by two domestic abuse defendants. See State v. Amenhauser, et al., Nos. FECR004789, FECR004847, FECR004846, slip op. at 2–3 (Iowa Dist.Ct. Jan. 29, 1997).[3] Before taking her on as a client, however, Daily discussed his representation of Siegel with Schreiber while in

Neary's presence. Schreiber v. State, 2004 WL 148513, at *3. Schreiber "had no problem with the situation." Id. In his merits brief, however, Schreiber denies agreeing to the arrangement. In his postconviction brief for further review, Schreiber admitted discussing the matter, did not deny that he consented, and noted that he told Daily if he found out later that Daily's representation of Siegel was illegal, he would file a complaint against Daily (Appellant's Pro Se Brief for Further Review, April 14, 2004, at 7).

Daily represented Siegel from January 6, 1997, until February 18, 1997. The district judge, the Honorable Phillip R. Collett, presided over this action in which Daily represented Siegel, see Amenhauser, No. FECR004789 etc., slip op. at 1, and later presided over Schreiber's murder trial. On January 27, 1997, while Daily still represented Siegel, Schreiber filed a pro se motion to compel discovery, which asked the district court to compel Siegel to turn over exhibits Schreiber alleged were missing. Schreiber did not assert in this motion, or at any time prior to appealing his conviction, that he felt Daily was acting under a conflict of interest. Daily withdrew as Siegel's attorney after receiving a favorable result.

Schreiber's trial began August 18, 1997. Due to the nature of the claims being asserted in the current petition for writ of habeas corpus, some detailed discussion of the largely circumstantial evidence must be pursued.

---

1. Evelyn Tangie was also charged with Terry's murder and was convicted in a separate trial. State v. Tangie, No. 98–0896, 2000 WL 142096, at *1 (Iowa App. Feb. 9, 2000).

2. Kirk Daily is currently a district associate judge for Iowa Judicial District 8A. In other circumstances, the Court would refer to him with his judicial title. Because he was not a

judge during the events surrounding Schreiber's trial and conviction, however, the Court does not observe that formality in the background of this matter.

3. Siegel sat on the board of directors of a local crisis shelter, and the defendants in that case argued her board position posed a conflict of interest.

Francis Garrity, Ph.D., M.D., Polk County and Deputy State Medical Examiner, testified about the autopsy he performed on John Terry. After establishing that Dr. Garrity had not received training as a surgeon, Neary challenged Dr. Garrity's qualifications to be a medical examiner because Iowa law requires a medical examiner to be a surgeon. Neary argued that because Dr. Garrity did not have surgical training, he was not a surgeon, not qualified to be medical examiner, and therefore not qualified to testify as an expert. The court and attorneys apparently had a conference in chambers about the issue, which the court reporter did not transcribe.[4] After the conference, Hammerand introduced Dr. Garrity's license to practice medicine in Iowa, which is a license to practice medicine and surgery. The court then overruled Schreiber's objection to Dr. Garrity testifying as an expert.

In his testimony, Dr. Garrity gave a detailed description of Terry's injuries, which included multiple lacerations to the back of his head caused by a blunt-force instrument that were the cause of death. He determined Terry's death was a homicide. Dr. Garrity noted that Terry had liver disease consistent with chronic alcohol abuse and at the time of his death, his blood alcohol level was 0.256 grams per liter, or two-and-a-half times the legal limit. Dr. Garrity testified that Terry's time of death was in a window encompassing one and one-and-a-half to two days prior to the autopsy, which was performed July 29, 1996, at 10:00 a.m. Dr. Garrity noted this was consistent with death occurring Saturday night July 27, 1996, after 6:00 p.m. Finally, Dr. Garrity testified that the pick handle with blood matching Terry's could have caused the trauma to Terry's head.

Deputy Sheriff Mark Miller testified that he gathered evidence at Terry's murder scene on July 28, 1996. Later that day, he picked up a pick handle from a witness who found the handle by the side of a road near where Terry's body was found. The blood on the pick handle matched Terry's blood. After identifying the body, Miller interviewed Gerlich and Tangie. On July 30, Miller and Agent Sammons of the DCI went to Gerlich's house for a second interview, and Schreiber was in Gerlich's yard at the time. When the officers pulled in front of the house, Schreiber approached the car and started a conversation, telling Sammons that Terry was very drunk and stumbling when Terry left Gerlich's house. According to Miller, before Schreiber made this statement, law enforcement was not aware that Schreiber was at Gerlich's house the night Terry disappeared because Gerlich and Tangie had left that information out of their statements. Neary established through cross examination of Miller that Gerlich's statements in her first two interviews with him were consistent, and later made Gerlich admit that these statements were not consistent with her testimony at trial. Neary also asked Miller about the reputation of Tony Bone (who was to testify later) for truthfulness, to which Miller responded that Bone was always in trouble.

Gerlich, a friend of Tangie and Schreiber, testified that Tangie, Terry, and Schreiber, in addition to her children and possibly a few other people, were at her home on the day Terry disappeared. On that afternoon, Gerlich took Tangie to meet Schreiber on East Main Street in Ottumwa. After Gerlich and Tangie returned to Gerlich's home, Gerlich gave Tangie a ride to see Schreiber's bus locat-

---

4. It seems generally understood a conference regarding this objection took place in chambers, though there is no specific record to that effect.

ed at Deer Ridge Trailer Park. They met Schreiber there, and Gerlich left Tangie and Schreiber at his bus while she visited her friends who lived at the park. After leaving Deer Ridge, Gerlich gave Tangie a ride home, and Gerlich planned to go inside to visit. When Gerlich exited the car, Terry, with whom Tangie lived, told her he did not want her coming inside because he was upset that Tangie was late. Gerlich got in her car and returned home.

Gerlich testified that after returning home, she spoke to Tangie on the telephone two or three times. Gerlich's testimony about these calls was, in pertinent part as follows:

> She wanted me to call John up about coming over, and at first I told her no because John was mad, John Terry, and then a little bit later she called again wanting me to. And I decided to ask John about coming over, and John said no. And a little bit later she calls again, and I talked to John Terry that time.

(Tr. at 209.) After the last call, Terry agreed to come to Gerlich's home. Gerlich drove and picked up Tangie, Terry, and Tangie's son, Toby Tangie, and on the way back, they purchased alcoholic beverages.

Gerlich testified that when the group arrived, she noticed Schreiber's car was parked in an alley behind her home, an unusual place for a visitor to park. Tangie went out to Schreiber's car to talk to him. Terry and Gerlich followed, and Gerlich asked Schreiber to go to the grocery store for her to get a soda, and Schreiber, Terry, and Toby went to the grocery. Terry had taken a container of orange drink and vodka along for the ride, and Gerlich noticed he was very drunk when the three returned. Later, as the day was getting darker, Schreiber, Tangie, and Terry left Gerlich's house to go look at a trailer. When the group left, Schreiber was driving.

Later that night, Tangie and Schreiber returned in Schreiber's car. Terry was not with them. Gerlich noticed that when Schreiber and Tangie returned, both were wearing different clothes and had wet hair. When Gerlich asked, "Where is Terry?" neither Schreiber nor Tangie responded. That night and the next day, Gerlich continued to ask Schreiber and Tangie "Where is Terry?" and neither answered.

Gerlich testified that law enforcement officers arrived at her front door the next day (Monday, July 29, 1996). Hammerand asked whether Gerlich told the officers everything she knew, to which she responded,

> A: I don't think so because I was scared and confused to because Evelyn was wanting me to say one thing, and I didn't know if it was something I wanted to say or if it was something that she was wanting me to say.
>
> Q: So Evelyn was there?
>
> A: Right. Because when they asked me what time of day it was when they, they was at my house, I told them I couldn't give a time. She wanted me to give a time that she wanted.

(Tr. 232–33.) At this point, Neary objected on the basis of hearsay and asked that his objection precede the last part of the answer. The court sustained the objection.

During his cross examination of Gerlich, Neary emphasized her testimony that Terry was mad when she dropped Tangie off at the apartment. Neary also emphasized Gerlich's testimony that Tangie called three times to ask Gerlich to encourage Terry to come over for dinner. Gerlich said she was concerned about Terry's whereabouts.

Neary also pointed out that Gerlich had memory problems and that her deposition

testimony was inconsistent with her trial testimony. Neary highlighted that Gerlich told investigators that Terry left the house alone the night he disappeared, which contradicted her trial testimony that Schreiber and Tangie accompanied him when he left. He also pointed out that she had told investigators that Schreiber and Tangie returned an hour after leaving with Terry but that she did not remember the time frame at trial.

During Gerlich's testimony, juror Janet Jackson notified the trial court of concerns she had about members of the gallery. At first, the court and attorneys believed that Jackson knew witness Mary Gerlich. Jackson cleared up this misconception, stating, "I do not know her, but I know the people that she's talking about. The people that came in the courtroom, I do know them." (Tr. at 244.) She identified the people in the courtroom as Chuck Denham, Sr., and Harold Kemp. The court made sure that Denham, Sr., and Kemp were not witnesses—the prosecution and defense attorneys agreed they were not. Next, the court asked Jackson whether she could serve as a fair and impartial juror, to which she answered, "[j]ust as long as they don't bother me no more." (Tr. at 245–46.) The court then re-established that the men in the gallery were not witnesses, noted that the court aspired to make sure that jurors were not "troubled," and Jackson responded, "[t]hey made me nervous." (Tr. at 246.) Finally, the court asked, "[e]ven though you may be nervous, you can still serve and be fair and impartial?" Jackson assured the court that she could. (Tr. at 246.)

Karen Brown, who lived near Schreiber at Deer Ridge, testified that Schreiber did not have a phone, and that on July 27 he received two calls at her home from a woman identifying herself as his girlfriend, and who seemed upset and in a hurry to talk to Schreiber. Schreiber told Brown that he had given her number to his girlfriend, Evelyn. After taking both calls, Schreiber left in his car.

The next day (Sunday, July 28), Schreiber told Brown he had a fight with Evelyn's boyfriend the previous night because he was pushing her around. Specifically, Brown reported Schreiber said he hit Evelyn's boyfriend, that he had "beaten the crap out of" him, and that "Evelyn Tangie's boyfriend wouldn't be hurting anyone else." (Tr. at 280.) On cross examination, Daily established through Brown that Schreiber sometimes told stories. He also brought out that in her deposition, Brown had not testified that Schreiber said he hit Evelyn's boyfriend or that he said the fight occurred the night before.

Charles "Chuck" Denham, Jr., who described himself as Schreiber's friend, owned Deer Ridge Estates, the trailer park where Schreiber lived, in July 1996. Schreiber did maintenance work and odd jobs at the park before and during Denham's ownership. Schreiber had access to the park's wide range of tools, which were kept in the locked pump house to which only Denham and Schreiber had access. Some of the park's tools were painted orange. The park had pick handles and ax handles, but these were not painted orange. When presented with the bloody pick handle with orange paint, Denham noted that the orange paint looked like over spray—paint that got on the handle when someone was painting something else—but was heavy enough to look deliberate. On cross examination, Denham testified that all of the picks at Deer Ridge had the metal head on them, and he was not missing any pick handles.

On Thursday, July 25, 1996, Schreiber told Denham that a woman, apparently Tangie, wanted to move in with him or have him move in with her. On July 26,

Schreiber told Denham he and the woman were looking at potential trailers. On July 27, Schreiber was using his car to help Denham move tools from the Deer Ridge pump house to Denham's garage in Ottumwa. Schreiber and the woman were also planning to look at trailers that day.

During discussions about Schreiber's relationship with Tangie, Denham warned Schreiber something was not right because they did not know each other well and she wanted to move in with him. Schreiber mentioned to Denham that "she had a boyfriend and that he was a real asshole ...." (Tr. at 292.) Denham loaned Schreiber money to buy gas on July 27 because Schreiber told him that he, Gerlich, and Tangie planned to get Tangie's boyfriend drunk and Schreiber would take him to Des Moines and drop him off. On July 28, Denham asked Schreiber if the Des Moines plan worked, but Schreiber said he had not had enough money to do it.

On July 29, Denham, who teased Schreiber on a regular basis, teased Schreiber about Terry's murder. Denham told Schreiber that being the new boyfriend, he would be the number one suspect. In response, Schreiber told him, "I was with you all day Saturday." (Tr. at 296.) Denham thought Schreiber's response was not a serious one. Denham also saw Schreiber the day he was arrested, July 30, and testified Schreiber was wearing the same clothes he wore July 27. Denham noted the clothes did not have blood on them and that it was Schreiber's habit to wear the same clothes until somebody complained.

Before beginning the third day of the trial, the court held a conference in chambers with alternate juror Mary Grace Davis. In response to questioning by counsel, Davis reported to the court that on the previous night, Chuck Denham, Sr., called her at home to ask her what she thought of his son's testimony. During the conversation, Davis told Denham, Sr., that she thought Schreiber was guilty. In the conference, Neary asked whether Davis had discussed her opinion of Schreiber's guilt with other jurors and whether other jurors had discussed the case. Davis answered "no" to both questions. Schreiber's attorneys moved to excuse Davis as an alternate juror, and the court granted the motion.

Barbara Thompson, who lived with Denham, Jr., at the time of the murder, corroborated Denham, Jr.'s, testimony that Schreiber had talked about moving in with Tangie and that Schreiber and Tangie had been together three or four times in the days surrounding the murder. Deon Babcock, April Babcock's twelve-year-old daughter, testified that she spent the night at Gerlich's house the night Terry was murdered. Deon remembered Tangie, Schreiber, and Terry leaving together in Schreiber's car and that they did not return before she went to bed at 10:30 p.m.

Cemeron Babcock, Deon's ten-year-old brother, also testified that Schreiber, Tangie, and Terry left together in Schreiber's car, and that he did not observe them returning. Importantly, Cemeron also testified about seeing a wooden ax handle in Schreiber's car and placing it in the back window of the car. Cemeron asked Schreiber about it, but he did not say anything. On cross examination, Daily established that Cemeron had not talked to anyone from the state about the ax handle until February 1997, and that he had not told anyone about seeing it until that time. Daily pointed out copious inconsistencies between Cemeron's deposition testimony and his trial testimony regarding collateral matters, including how he spelled his first name, who brought him to Gerlich's, who took him home, and the color of Schreiber's car. Daily also established that Cem-

eron thought that by approaching the state in February 1997, the state would help him on a shoplifting charge.

April Babcock testified she was present at Deer Ridge on July 27 when Terry, Schreiber, and Tangie were looking at trailers. She saw Schreiber with Tangie the following morning. Babcock was interviewed about the case because Schreiber told her in front of an investigator that he had not been looking at trailers with Terry and Tangie, and she called him a liar. Babcock also testified she received a call from Gerlich, who said that Terry left her house with Schreiber and Tangie. Daily impeached this statement with Babcock's deposition testimony that Gerlich had told her Terry staggered out of the yard drunk.

Tobie Tangie testified to a similar version of events as the other witnesses: on the evening Terry disappeared, Terry, Tangie, and Tobie went with Gerlich to the grocery store for beer and alcohol and then went to Gerlich's house. Schreiber was there and eventually left with Terry and Tangie. Tobie stayed at Gerlich's house until about midnight, when he returned to Tangie and Terry's apartment. Schreiber and Tangie had not returned when Tobie left. Later that night, Tobie returned to Gerlich's house, and Schreiber and Tangie were there.

Tony Bone had lived at Deer Ridge earlier but frequently visited his parents there at the time Terry was murdered. He testified that he and Schreiber had a conversation toward the end of July 1996, and although he could not remember all of the details, Bone remembered Schreiber telling him, "I beat him with an ax handle." (Tr. at 480.) Neary showed that Bone had a charge of possession of drug paraphernalia pending when he told Officer Miller about Schreiber's statement and that the charge was later dismissed.

Neary also showed that Bone's testimony about the time that Schreiber made the statement and the time that Bone reported the statement to Miller were inconsistent with what Bone told Miller and what Bone said in his deposition.

The state's final witness was Special Agent Mower of the DCI. Mower testified that he interviewed Schreiber on July 30. Schreiber told Mower that he met Tangie on July 27 to discuss getting Tangie a restraining order against Terry and keeping her away from Terry until they could get the restraining order. Schreiber told Mower he was trying to start a relationship with Tangie, but she could not get away from Terry. Schreiber suggested that Tangie stay in a trailer for the weekend and offered to help her find one.

Schreiber told agent Mower that he initially spoke with Tangie, but Terry was upset at him for not talking to Terry about trailers. Schreiber said he, Tobie, and Terry went to Deer Ridge to look at trailers and that Terry was drunk at that point. They returned to Gerlich's house and continued drinking beer. Schreiber said he went inside to use the restroom, and when he returned, Terry was gone. Schreiber said he returned to his residence "around dark" and called Tangie to see if Terry had returned. Mower asked Schreiber how he made such a call because Mower remembered he did not have a telephone. After the interview with Mower, Schreiber saw April Babcock on the street awaiting an interview, and Schreiber volunteered that Mower should not believe anything she told him.

Schreiber told Mower he heard rumors that somebody in Ottumwa was bragging about killing Terry, but Schreiber would not initially tell Mower who told him the rumor. Schreiber also said to Mower, "So I'm the number one suspect again?" and "Things looked bad for us." (Tr. at 509.)

Schreiber called Mower an hour later to tell him that the person bragging about killing Terry was Raymond Gruwell, who Schreiber described as a "bad mother" or something of that sort. During this second phone call, Schreiber told Mower he wished the police would "lay off" his girlfriend, Tangie. Mower asked Schreiber to come to the station to talk face-to-face, but Schreiber said he had too much alcohol to drive to the station.

Around 11:00 p.m. on July 30, Mower and Deputy Phillips went to Schreiber's residence to interview him further and to arrest him. When Mower and Phillips parked near Schreiber's residence they noticed that a pile of trash was on fire and Schreiber was walking toward them from that area. Schreiber volunteered he did not set the fire.

The three men went inside, and Mower advised Schreiber of his Miranda rights.[5] Mower told Schreiber he knew Schreiber had killed Terry and that the police had recovered the murder weapon. To this, Schreiber responded, "I guess Evelyn told you." (Tr. at 515.) On the way to the jail, Schreiber asked Mower what Tangie was charged with. Mower asked what she should be charged with, and Schreiber responded, "I suppose she said she was there if she told you I did it." (Tr. at 516.)

Brenda Terry, John Terry's ex-wife, was the only defense witness. She testified that while they were married, John Terry drank between one and two cases of beer three nights a week. She testified that he would wander off when he drank and would usually return three days later.

During his closing argument, Hammerand referred to "skin slippage" that he alleged occurred when Terry's body was fingerprinted at the scene of the crime. Schreiber's attorneys lodged a timely objection to the statement, arguing that there was no testimony referring to skin slippage. Schreiber's attorneys agreed to make a record of their objection after the court submitted the case to the jury. During this proceeding, the parties made a record which reads, in pertinent part, "during closing argument in rebuttal Assistant Attorney General Doug Hammerand said in relating to time of death that there was testimony during the trial that there was skin slippage of the decedent when fingerprints were taken indicating that ...." (Tr. of Evidence at 5.) Both parties agreed to this record. Neary moved for a mistrial due to Hammerand's misstatement of the evidence. He argued that the statement was improper and insofar as it related to Terry's time of death, that it would unduly influence the jury. Alternatively, Neary requested that the court instruct the jury to disregard the statement. The court overruled both motions. The jury found Schreiber guilty of first degree murder, and the court sentenced him to life in prison.

After his trial, Schreiber filed ethics charges against Daily alleging he had a conflict of interest due to his representation of Siegel. *See Schreiber v. Bastemeyer*, 644 N.W.2d 296, 297 (Iowa 2002). The action was dismissed by the Iowa Supreme Court Board of Professional Ethics and Conduct. *Id.* Schreiber then filed suit against Norman Bastemeyer, Administrator of the Board, for dismissing his claim. *Id.* The Iowa Supreme Court reviewed the case and found that "Schreiber had been informed on two occasions of the possible conflict and in both instances Schreiber had indicated he had no problem with the situation." *Id.*

In respect to Schreiber's direct appeal of his murder conviction, the Iowa Court of

5. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Appeals affirmed the district court. *State v. Schreiber*, No. 97–1999, slip op. at 1 (Iowa Ct.App. Mar. 3, 1999). Schreiber brought three of the ineffective assistance claims that he asserts in his § 2254 petition, and the court of appeals preserved two of these claims for postconviction review because the record was insufficiently developed. *Id.* at 5. The court addressed the third claim—that co-counsel were ineffective for failing to have the in-chambers discussion regarding Dr. Garrity's credentials transcribed. *Id.* at 6. The court denied this claim because it found that the state's introduction of Dr. Garrity's medical license, which allows him to practice medicine and surgery, rendered moot Schreiber's argument that Dr. Garrity was not qualified. *Id.*

On postconviction review, Schreiber had depositions taken of Daily and Neary. Daily explained the reason for not having closing statements recorded was that Hammerand was from the Attorney General's office, and from Daily's perspective, the Attorney General's office tried "clean cases." (Daily Depo. 30, Nov. 3, 2000.) Expecting a clean case, Daily explained that he anticipated Hammerand would not object to the defense's closing and that Hammerand would not make any objectionable arguments. (*Id.*) Daily also noted that it was Neary who objected to the "skin slippage" statement. Daily said it was his practice when trying a case against a prosecutor who tries a clean case not to object to minor or unimportant misstatements the prosecutor might make in closing. (*Id.*)

Furthermore, Daily characterized Hammerand's "skin slippage" statement as a "non-issue" and described his reason for arguing that time of death was important as "hoping that it might stick and might strike a cord [sic]." (*Id.* at 48.) He noted time of death was not the theme of the case because the state had "too many witnesses saying he left with him, [and] came back without him" to insist that Schreiber was somewhere else at the time of the murder or that he could not have been at the scene at the time of the murder. (*Id.* at 48.) The theme of the case, according to Daily, was that the state's entirely circumstantial case could not hold up because the state's "witnesses are all a bunch of liars and in it for their own skin . . . ." (*Id.*)

In Neary's deposition, when asked why he did not object to Gerlich's testimony that when she dropped Tangie off at her apartment, Terry told her to leave, Neary responded, "[s]ometimes during a trial things come in, and it seems better not to emphasize it by asking that the jury . . . be told to forget what they just heard." (Neary Depo. 14.) He continued, "Even though it's hearsay to the extent that it's something that was made out of court, I don't think, listening to it, it sounds like something I would think was so damaging that you would want to emphasize it at all." (*Id.*) Neary agreed that not objecting to unimportant statements, even if hearsay, is a tactical or strategic decision. (*Id.*)

Neary also noted that the statements showing that Terry was angry with Tangie were helpful to the defense's theme of the case because he and Daily wanted to show Terry as having a temper, a violent disposition, and that he was upset the night he disappeared. (*Id.* at 15.) In respect to Gerlich's later testimony that Tangie called her and wanted her to convince Terry to come over that evening, Neary agreed it was hearsay and offered a similar justification—that it was background testimony establishing how Tangie and Terry came to be at Gerlich's house that evening and not damaging enough to emphasize. (*Id.* at 17.)

In respect to Hammerand's reference to skin slippage, Neary noted, "I didn't think it was very important.... The time of death was not a big thing for our defense." (*Id.* at 41.) Neary also stated that he had never had closing arguments recorded before Schreiber's trial and had them reported only once since. His practice was to make a record if an objectionable statement was made, as he did in Schreiber's case. (*Id.* at 38.) That strategy worked well for him. (*Id.*)

The district court on postconviction review denied the claims that the court of appeals had preserved and did not address Schreiber's conflict of interest claim nor his juror intimidation claim. *Schreiber v. State*, No. LALA102113, slip op. at 2 (Iowa Dist.Ct. Aug. 21, 2001). On postconviction, the Iowa Court of Appeals affirmed the district court's ruling on the ineffective assistance claims without comment but did evaluate Schreiber's claims of conflict of interest and juror intimidation. *Schreiber v. State*, 2004 WL 148513, at *1 (Iowa App.2004). The court of appeals determined Schreiber's claims were without merit and affirmed the judgment of the district court. *Id.* at *5.

On June 1, 2004, Schreiber filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. After filing multiple motions to amend the petition, he alleges the following grounds in the pending petition: Daily had an actual conflict of interest; both Daily and Neary were ineffective for failing to (1) have a record made of an in-chambers conference regarding the medical examiner's qualifications, (2) have the final arguments reported, (3) object to hearsay evidence, and (4) question a juror regarding her feelings of intimidation; and his attorney on direct appeal was ineffective for failing to raise the above claims.

## APPLICABLE LAW AND DISCUSSION

### I. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). Under AEDPA,

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is "contrary to" clearly established federal law if the state court applies a rule that contradicts governing law in Supreme Court cases or if the state court confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. *Lockyer v. Andrade*, 538 U.S. 63, 73, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). A state court "unreasonably applies" federal law if the state court identifies the correct governing legal principle but applies that principle to the facts of the petitioner's case in an objectively unreasonable way.

*Id.* at 75, 123 S.Ct. 1166. "Unreasonable" means something more than an "erroneous" or "incorrect" application of clearly established law, and a reviewing federal court may not substitute its judgment for the state court's, even if the federal court, in its own judgment, disagrees with the state court's decision. *Id.* "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Thus, a petition for writ of habeas corpus must surmount this demanding threshold.

## II. CONFLICT OF INTEREST

Schreiber argues that the decision of the court of appeals in his postconviction review, *Schreiber v. State*, 2004 WL 148513, at *4, was contrary to, or the result of an unreasonable application of, clearly established federal law regarding conflicted attorneys. He also argues the court based its decision on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Schreiber does not identify a Supreme Court decision with materially indistinguishable facts in respect to which the Iowa Court of Appeals reached a different result. *See Lockyer*, 538 U.S. at 73, 123 S.Ct. 1166. Likewise, he does not identify any governing law in Supreme Court cases contradicted by the rules applied by the court of appeals. *See id.* at 75, 123 S.Ct. 1166. Thus, Schreiber's claim that the decision of the court of appeals was contrary to federal law must fail. His unreasonable application claim and his unreasonable determination of the facts claim remain.

### A. APPLICABLE LAW

To determine whether Schreiber preserved error on his conflict of interest claim, the court of appeals addressed the merits of that claim, *see Schreiber v. State*, 2004 WL 148513, at *3–4, which is the part of its decision based on federal law this Court will evaluate under the reasonableness standard of 28 U.S.C. § 2254(d). The passage from *State v. Watson*, 620 N.W.2d 233, 238 (Iowa 2000), quoted by the court of appeals, sets out the applicable rules regarding conflicted attorneys from *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), and its progeny:

> Having resolved this conflict as to the circumstances under which the *Cuyler* test applies, we now set forth the legal principles applicable to conflict-of-interest claims such as the one before us, where the claim is raised for the first time on appeal. A trial court has the duty sua sponte to inquire into the propriety of defense counsel's representation when it "knows or reasonably should know that a particular conflict exists." *Cuyler*, 446 U.S. at 347, 100 S.Ct. 1708. If an actual conflict existed and the trial court knew or should have known of the conflict, yet failed to make inquiry, reversal is required. If the record on appeal shows only the possibility of a conflict, then the case must be remanded for a determination as to whether an actual conflict existed and/or whether the defendant made a valid waiver of his right to independent counsel. If, on remand, an actual conflict is found, prejudice is presumed and reversal is mandated. *If there is no indication that the trial court knew or should have known of an actual conflict, and defendant made no objection to his representation, then the defendant, in order to obtain a reversal on appeal, must prove that his counsel rendered ineffective assistance by proving that an actu-*

*al conflict adversely affected counsel's performance.*

*Schreiber v. State,* 2004 WL 148513, at *3 (quoting *Watson,* 620 N.W.2d at 238) (some citations omitted).

## B. UNREASONABLE DETERMINATION OF FACT CLAIMS

### 1. Schreiber's Waiver

■ As an unreasonable determination of the facts under § 2254(d)(2), Schreiber first cites the court's finding that he waived the potential conflict of interest. The court noted that it carefully reviewed the record and concluded that Schreiber had waived any potential conflict. *Schreiber v. State,* 2004 WL 148513, at *3. The court found that Daily and Schreiber discussed the potential conflict in the presence of Michael Neary on two occasions and that Schreiber raised no objection to the situation. *Id.* Specifically, the court of appeals found that "both times Schreiber indicated that he had no problem with the situation." *Id.* Based on this finding, the court held "Schreiber will not be allowed in a post conviction appeal to allege an error in which he himself acquiesced." *Id.*

Respondent points out that Schreiber admitted in a *pro se* brief submitted to the court of appeals that he "informed Mr. Daily, that if his representation of the County Attorney, caused the defense of his case to be jeopardized in any manner, the Defendant would raise the issue in his further proceedings." (Appellant's Pro Se Brief, August 15, 2002, at 31.) Moreover, in Schreiber's *pro se* reply brief, Schreiber again admitted "[o]nly once did I and Mr. Daily discuss the issue and I informed him [Daily] that if I found out that he was indeed violating the law I would bring a complaint against him." (Appellant's Pro Se Reply Brief, October 17, 2003, at 6.)

Essentially, Schreiber discussed the dual representation with Daily and said he would only object later if he learned Daily's actions were illegal or violated due process. A defendant is allowed to waive the right to conflict-free counsel if the waiver is knowing and voluntary. *See Cuyler,* 446 U.S. at 346, 100 S.Ct. 1708; *Wood v. Georgia,* 450 U.S. 261, 273–74, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981). From Schreiber's statement, it appears his waiver was knowing and voluntary. The record reflects he was aware of the nature of any conflict and simply wanted to reserve his right to complain if he later concluded the conflict resulted in actual prejudice.

Additionally, in their respective postconviction review depositions, both Daily and Neary recounted the state of events described by the court of appeals. Schreiber, however, notes multiple court filings wherein he denies acquiescing to Daily's representation of Siegel. Based on Schreiber's changing story about what took place when Daily discussed the dual representation with him and Daily's and Neary's consistent recollections of the discussion, Schreiber has not met his § 2254(e)(1) burden of presenting clear and convincing evidence that the court's finding was incorrect. Therefore, the finding by the court of appeals that Schreiber waived the conflict is not unreasonable.

This Court determined in its August 31, 2005, order (Clerk's No. 111) that the court's decision on whether Schreiber preserved error on his conflict of interest claim was not an adequate and independent state law ground preventing the court from addressing Schreiber's conflict of interest claim. *See Coleman v. Thompson,* 501 U.S. 722, 734–35, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Reagan v. Norris,* 279 F.3d 651, 656 (8th Cir.2002). Schreiber's waiver, however, was not a procedural default of his right to assert the conflict of

interest claim in state court proceedings but was a waiver of his Sixth Amendment right to have a non-conflicted attorney. *See Cuyler,* 446 U.S. at 346, 100 S.Ct. 1708. The state court's finding that Schreiber waived this right is sufficient reason to deny his § 2254 petition with respect to the conflict of interest claim. As an alternative holding, however, the Court will address the merits of the claim.

## 2. Trial Court's Knowledge

■ Schreiber also challenges the determination of fact by the court of appeals that the trial court did not have notice of the potential conflict of interest. An appellate court that determines from the record that a "possibility of a conflict of interest was sufficiently apparent" to the trial court must remand the claim to the trial court for a determination of whether there was a conflict or a valid waiver. *Wood,* 450 U.S. at 272–73, 101 S.Ct. 1097. The court of appeals noted that Schreiber agreed that his conflict of interest claim was a "non-notice" claim because Schreiber's counsel argued the claim from that position. *Schreiber v. State,* 2004 WL 148513, at *4. Before this Court, however, Schreiber attempts to recast his claim as a notice claim. He asserts that the state trial court did know or should have known of the potential conflict and that the court of appeals made an unreasonable determination of the facts in finding that the trial court did not know and should not have known of the potential conflict.

In his *pro se* reply brief before the postconviction court of appeals dated October 14, 2003, and stamped "Received" by the Iowa Justice Department's Criminal Appeals Division, however, Schreiber did assert that the Iowa District Court had notice of the potential conflict. The court of appeals addressed the conflict of inter-est issue from Schreiber's attorneys' stance instead of from Schreiber's. Schreiber does not cite any requirement that the court of appeals address his argument. "A criminal defendant has no federal constitutional right to appellate self-representation." *Martinez v. Court of Appeal,* 528 U.S. 152, 163, 120 S.Ct. 684, 145 L.Ed.2d 597 (2000). It was not unreasonable for the court of appeals to refuse to address Schreiber's *pro se* argument, especially since he was represented by counsel. In fact, the policy of the United States Court of Appeals for the Eighth Circuit is not to consider *pro se* briefs from criminal defendants if he or she is represented by counsel. *See e.g., United States v. Alaniz,* 148 F.3d 929, 933 n. 3 (1998) ("Pro se submissions by parties represented by counsel are ordinarily not considered.") (citation omitted).

As noted above, § 2254(d)(2) requires that, before a federal court may grant relief on a claim adjudicated by a state court on the merits, the state court's decision must be "based on an unreasonable determination of facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). If a petitioner, in state court, argues based on a certain factual predicate—*e.g.,* that a judge did not have notice of a potential conflict of interest—and the state court relies on the petitioner's statement of fact to deny the petitioner's claim, then this determination of facts seems fundamentally reasonable. Based on the representations of Schreiber's postconviction appellate attorney that the claim was a non-notice claim, the court of appeals was reasonable in making the factual determination that the district judge did not have notice of the potential conflict.

Even assuming that the court of appeals was unreasonable and the trial court knew or should have known of the conflict under

*Cuyler* or *Wood,*[6] by the time the claim reached post-conviction appeal, the court of appeals had a record before it that was developed during post-conviction proceedings and showed a valid waiver. The court, therefore, was not unreasonable for failing to remand to the district court for a determination of waiver. It was not necessary to remand for a hearing on the issue because Schreiber had already had the opportunity to depose his attorneys. For the above reasons, the finding of the court of appeals that the trial court did not know or have a basis upon which it should not have known of a potential conflict was not unreasonable.

## C. UNREASONABLE APPLICATION CLAIMS

Pursuant to the analysis above, Schreiber's claim is properly before the court as a non-notice claim. The court of appeals evaluated the merits of Schreiber's claim under *Cuyler,* 446 U.S. at 335, 100 S.Ct. 1708, noting that " '[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate an actual conflict of interest adversely affected his lawyer's performance.' " *Schreiber v. State,* 2004 WL 148513, at *3 (quoting *State v. Duncan,* 435 N.W.2d 384, 386 (Iowa App.1988) (citing *Cuyler,* 446 U.S. at 350, 100 S.Ct. 1708)). By quoting *Watson,* 620 N.W.2d at 238, the court of appeals set out the main principles from *Cuyler.*

Evaluating the claim under the non-notice framework as outlined in *Watson,* the court of appeals concluded that Schreiber failed to prove an actual conflict had adversely affected Daily's performance. *Schreiber v. State,* 2004 WL 148513, at *4.

The court concluded that Schreiber failed to show that Daily represented inconsistent interests or that Daily made a choice between possible alternative courses of action helpful to Siegel and harmful to Schreiber. The court did note, however, that Daily "aggressively pursued Schreiber's defense." *Id.* at *4.

The conclusion by the court of appeals that Schreiber did not show that Dailey and Siegel had inconsistent interests was not unreasonable. The standards for conflict of interest claims based on multiple representation developed mainly in cases where a criminal defense attorney represents multiple co-defendants, *see e.g., Cuyler,* 446 U.S. at 337–41, 100 S.Ct. 1708 (describing a situation where attorneys representing co-defendants failed to present a defense in the trial of one defendant that would have been favorable to that defendant but would have been detrimental to the other defendants), or where the attorney receives compensation from an individual with interests divergent from the defendant, *see e.g., Wood,* 450 U.S. at 272–73, 101 S.Ct. 1097 (evaluating a situation where the attorney was retained by the defendants' employer). In Schreiber's case, however, Daily did not represent a co-defendant and was compensated by the state.

In a situation where an attorney represents multiple co-defendants, the potential conflict is apparent to the trial judge and often implicates the "knows or should know" standard from *Cuyler.* An attorney must make decisions and pursue tactics in the best interest of his client. A conflict of interest very often arises where an attorney represents multiple co-defendants be-

---

**6.** The Court notes Judge Collett presided over the matter involving Ms. Siegel several months before also presiding over this murder trial. However, even assuming Judge Collett would have recalled the prior case and representation, nothing in the record impels a conclusion Judge Collett either did or should have recognized a conflict in this case.

cause, in many cases, a certain decision or tactic would benefit one defendant and prejudice another. *See Cuyler*, 446 U.S. at 346–47 n. 10–11, 100 S.Ct. 1708.

An instructive case is *United States v. Mett*, 65 F.3d 1531, 1533 (9th Cir.1995), which poses a similar situation. In *Mett*, the defendant's attorney represented the prosecutor on a drunk driving charge. *Id.* The court held that the defendant was not prejudiced by the situation, but Judge Kleinfeld, in a concurring opinion, offered his analysis to show that the defense attorney did not have a conflict of interest. *Id.* at 1537 (Kleinfeld, J., concurring). Judge Kleinfeld argued, in pertinent part,

> A lawyer's duty to avoid conflict of interests arises from agency law. The ancient principle is that '[n]o man can serve two masters.' Matthew 6:24. The contemporary statement is that an agent's fiduciary duty requires him to 'act solely for the benefit of the principal in all matters connected with his agency,' and 'not to agree to act during the period of his agency for persons whose interests conflict with those of the principal in matters in which the agent is employed.' Restatement 2d, Agency §§ 387, 394. Conflict of interests is not a matter of whether a lawyer's clients like each other, or whether the untutored may think it odd for a lawyer to be representing unlike clients.

*Id.* at 1538. These core principles necessarily drive the Court's evaluation of the issue.

Applying Judge Kleinfeld's analysis to Daily's representation of Siegel, it appears that "[n]either client would benefit from the suffering of the other." *Id.* In other words, Daily could diligently represent Siegel's interest in winning her earlier case while diligently representing Schreiber's interest in winning his. Daily represented Siegel's interests related to her own alleged conflict of interest case. Her interests in that case were entirely unrelated to Schreiber's case and no longer being pursued.

Schreiber argues that Daily was conflicted because he desired to represent Siegel or the Wapello County Attorney's Office again, and he provided Schreiber ineffective assistance in order to please the prosecutors. While the situation may reasonably generate such speculation, there is nothing in the record supporting this alleged motive, or that the County Attorney needs private representation on a recurring basis. The decision of the court of appeals, concluding that Dailey did not represent any interest of Siegel that was contrary to Schreiber's interests was not unreasonable.

Even assuming that Daily's representation of Siegel posed an actual conflict of interest, the next aspect Schreiber must prove is that the actual conflict adversely affected Daily's performance. *See Cuyler*, 446 U.S. at 350, 100 S.Ct. 1708. The court of appeals concluded that Schreiber had not shown an adverse effect on Dailey's performance. To show that Daily made a choice between alternative courses, Schreiber pointed to the circumstances surrounding juror Janet Jackson. Schreiber argues that Daily's alleged conflict of interest caused Daily's (and presumably Neary's) failure to pursue Jackson's assertion that she was intimidated. Schreiber also alleges eight other grounds that allegedly show Daily was ineffective. Schreiber did present these other grounds to the court of appeals in a *pro se* brief, but he was represented by counsel, and the court apparently chose to evaluate only counsel's arguments. Because Schreiber's appellate attorney presented only the juror intimidation issue to the court of appeals, and because the court of appeals only addressed that argument in respect to

its decision on prejudice, that is the only ground of its decision this Court may review pursuant to § 2254. *See Myartt v. Frank,* 395 F.3d 782, 785 (7th Cir.2005) (holding that a claim brought in a *pro se* brief that the state court did not address was not "adjudicated on the merits" as required by § 2254(d)).

Schreiber does not establish an adverse effect based on the juror intimidation issue. There is no demonstrable link between Daily's supposed conflict of interest and a failure to pursue questioning a "nervous" juror. In *Cuyler,* for example, the adverse effect was the conflicted attorney's failure to present a defense favorable to one defendant but potentially harmful to the other defendants. *Cuyler,* 446 U.S. at 337–41, 100 S.Ct. 1708. There was a demonstrable link between that conflict and the deficient representation; the attorneys represented defendants with divergent interests and made a choice helpful to one and harmful to the others. There is no link between Daily representing Siegel six months before Schreiber's trial and his decision not to question Janet Jackson about her nervousness.

After a careful review of the record, it is clear that the court of appeals was correct in finding that Daily aggressively pursued Schreiber's defense. *See Schreiber v. State,* 2004 WL 148513, at *4. Because Daily did not have an actual conflict of interest, because there is no demonstrable link between Daily representing Siegel and his decision not to pursue Jackson's nervousness, and because Daily's representation was aggressive, Schreiber has not established an adverse effect. For these reasons, and the reasons articulated above, Schreiber's claim that Daily acted under a conflict of interest must fail; and, in respect to this claim, his § 2254 petition must be denied.

## III. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

To establish ineffective assistance of counsel, Schreiber must demonstrate his counsel's or counsels' performance was deficient, and the deficiency prejudiced him. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Deficient performance, the first step of the analysis, is one that is below an objective standard of reasonableness. *Id.* at 687–88, 104 S.Ct. 2052. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead ha[s] emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Wiggins v. Smith,* 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (quoting *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.). There is a "strong presumption" that trial counsel's actions constitute reasonable trial strategy. *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052; *Walker v. Lockhart,* 852 F.2d 379, 381 (8th Cir.1988). Strategy choices are given a great amount of deference. *See Sanders v. Trickey,* 875 F.2d 205, 207 (8th Cir.1989) ("[A] court must avoid second-guessing trial strategy."). To show prejudice from such a deficient performance, the second step, Schreiber must demonstrate "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

This Court evaluates a state court's decision on ineffective assistance under the familiar "unreasonable application" standard of § 2254, as described above. *See Bell v. Cone,* 535 U.S. at 694–95, 122 S.Ct. 1843. In other words, on § 2254 review, in order to grant relief the Court must conclude that the state court's decision was

unreasonable. After evaluating the Iowa courts' ineffective assistance decisions pursuant to the § 2254(d) reasonableness standard, the Court finds no basis upon which to conclude that the decisions were unreasonable.

## A. FAILURE TO HAVE IN–CHAMBERS DISCUSSION RECORDED

■ Schreiber's counsel brought to the attention of the trial court that Dr. Garrity never received surgical training. Iowa law requires a medical examiner to be a medical doctor and a surgeon. *See* Iowa Code § 691.5 (1997). The trial court held a conference in chambers to evaluate Schreiber's argument that Dr. Garrity was not qualified to be a medical examiner because he had not been trained as a surgeon. This conference was not transcribed by a court reporter. The record shows, however, that although Dr. Garrity never received surgical training, his Iowa medical license permits him to practice "medicine and surgery." (Tr. at 118.) On this basis, the trial court found Dr. Garrity was qualified to testify as an expert.[7]

The court of appeals, on direct review, determined that after Dr. Garrity's medical license was admitted as evidence, the in-chambers discussion about his qualifications was moot. *State v. Schreiber,* No. 97–1999, slip op. at 6 (Iowa Ct.App. Mar. 3, 1999). On this basis, even if the Court were to assume that Neary and Daily provided ineffective assistance by failing to ensure the discussion was transcribed, Schreiber was not prejudiced. The court of appeals was not unreasonable in concluding that Dr. Garrity's license to practice surgery was the basis on which the district court determined Dr. Garrity was qualified as an expert. Therefore, the court was not unreasonable in concluding that Schreiber was not prejudiced by not having a record of the specific in-chambers discussion.

Schreiber also argues that if the proceeding in chambers were transcribed, he would have more grounds for showing his attorneys provided ineffective assistance. The court of appeals did not evaluate this circular argument, and pursuant to § 2254(d), this Court may not address it. *Krimmel v. Hopkins,* 56 F.3d 873, 875–76 (8th Cir.1995). Because the absence of a record of the in-chambers proceeding regarding Dr. Garrity's qualifications caused Schreiber no prejudice, his claim that his attorneys were ineffective for failing to have a record made must be denied.

## B. FAILURE TO HAVE CLOSING ARGUMENTS RECORDED

■ Schreiber's next ineffective assistance of counsel argument is that his attorneys provided ineffective assistance by failing to ensure that closing arguments were transcribed. On direct review, the court of appeals preserved this issue for postconviction review because the record was not sufficiently developed. *State v. Schreiber,* No. 97–1999, slip op. at 6. The post-conviction trial court addressed and denied the claim. *Schreiber v. State,* No. LALA102113, slip op. at 4 (Iowa Dist.Ct. Aug. 21, 2001). The postconviction court of appeals affirmed the trial court on this claim without further evaluation. *Schreiber v. State,* 2004 WL 148513, at *5. Therefore, the decision of the postconviction trial court is the operative decision for purposes of Schreiber's § 2254 petition.

---

7. The reference to surgery in § 691.5 Iowa Code (1997) has not been further explained or interpreted by the Iowa courts but appears to simply be consistent with the terms of an Iowa license to practice medicine, which the record reveals Dr. Garrity possessed.

Schreiber argues first that this failure caused him prejudice because the trial court was unable to have the court reporter read the closing argument back when it evaluated Schreiber's motion for a mistrial. Second, Schreiber argues that prejudice occurred because reviewing courts evaluating his claim were unable to evaluate the precise statements the prosecutor made in closing arguments. Finally, Schreiber asserts that the jury "could have speculated" about the victim's time of death and that the statement "probably confused the jury" on that question. (Pet'r's Merits Brief at 21.)

The record of Daily's and Neary's respective depositions shows that the decision whether or not to request that closing arguments are recorded is a strategic decision. Daily explained that he did not expect any objectionable statements by the prosecution. In addition, Daily admitted the "skin slippage" statement was not important to the case. Neary also explained that the decision whether to have closing arguments recorded is a matter of personal preference and strategy. If Schreiber's attorneys' decision not to have closing statements recorded was a strategic decision, it would be afforded great deference. *See Strickland,* 466 U.S. at 689, 104 S.Ct. 2052; *Walker,* 852 F.2d at 381; *Sanders,* 875 F.2d at 207. It is difficult, however, to conceive of a strategic reason to forego making a record of final arguments.[8]

In so serious a matter as a murder trial, a complete record of the proceedings would seem a fundamental goal of trial counsel. However, even if Schreiber's attorneys' decision constituted deficient performance, which this Court need not find, the decision did not cause him prejudice. Schreiber notes that the prosecutor's ref-

erence to "skin slippage" reflected upon the victim's time of death. Dr. Garrity's estimate of Terry's time of death was an important piece of evidence linking Schreiber to the murder. Schreiber asserts that Hammerand's skin slippage statement suggests to the jury that Dr. Garrity's time-of-death estimate was inaccurate. A statement that might make the jury think less of Dr. Garrity's time-of-death determination—a determination detrimental to Schreiber—does not prejudice Schreiber. Further, any impact on the opinion of time of death appears of no consequence to the defense theme being pursued.

Schreiber's next argument is that he was prejudiced by having no record of closing statements because the trial court could have had the closing argument read back while evaluating Schreiber's motion for a mistrial. Hammerand made the statement during the state's rebuttal argument, and the court submitted the case immediately after closing arguments. In the conference addressing the issue, the trial court allowed Neary to make a record of the improper statement immediately after the case was submitted to the jury. The statement was fresh in each party's mind. The court, in fact, recalled the statement during the conference. Although the court inaccurately recalled some mention of skin slippage during testimony, the court explained that it would overrule Schreiber's motion for a mistrial and his request for a jury instruction to disregard the statement even if evidence of skin slippage was not in evidence. Because the court allowed Schreiber's attorneys to make a record of the improper statement soon after it was made, and because the court recalled the statement

---

8. The Court recognizes trial counsel frequently opt for no official record of final arguments, either as a matter of courtesy or an apparent lack of need. However, no proper strategic purpose can be discerned from avoiding a verbatim record.

when it considered Schreiber's motion for a mistrial and request for a jury instruction, Schreiber has not shown prejudice in this respect.

Schreiber's last argument in respect to this issue is that the lack of a transcript of closing arguments prevented an appellate court from fully evaluating his claims. Schreiber has not shown prejudice in this respect for the same reason as just described. The post-submission conference in chambers provided a sufficient record for a reviewing court to determine the nature of the statement and the court's ruling. For this reason, and those noted above, Schreiber has not shown he was prejudiced by his attorneys' failure to have closing statements recorded. Thus, Schreiber's § 2254 petition must be denied in respect to this claim.

## C. FAILURE TO PREVENT ADMISSION OF HEARSAY EVIDENCE

Schreiber's next argument is that his attorneys were ineffective for failing to prevent admission of hearsay testimony of Mary Gerlich. On direct review, as with the "failure to record closing statements" issue, the court of appeals preserved this issue for postconviction review because the record was not sufficiently developed. *State v. Schreiber*, No. 97–1999, slip op. at 6 (Iowa Ct.App. Mar. 3, 1999). As with that issue, the decision of the postconviction trial court, *Schreiber v. State*, No. LALA102113, slip op. at 2–4 (Iowa Dist.Ct. Aug. 21, 2001), is the operative decision for purposes of Schreiber's § 2254 petition. To establish that his co-counsel provided ineffective assistance, he must show deficient performance and prejudice resulting therefrom. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.

Schreiber focuses his argument on the reasons that hearsay evidence is harmful as a general matter, but utterly fails to show that Gerlich's testimony caused him harm. He alleges the statements by Tangie testified to by Gerlich "may have established" a motive for the murder or a plan to do something non-criminal to Terry. (Pet'r's Brief at 23.) · Neary and Daily both testified in their depositions, however, that Gerlich's hearsay testimony was not important and certainly not harmful enough to merit the attention a hearsay objection draws to a statement. Moreover, Daily's and Neary's strategy was to portray Terry as angry the night he disappeared, and Tangie's statements that Gerlich recounted showed he was angry. Neary even had Gerlich discuss the statements again on cross examination. Thus, Schreiber's attorneys' decision not to object to the hearsay evidence was a strategic decision, and strategic decisions are afforded great deference. *See Strickland*, 466 U.S. at 689, 104 S.Ct. 2052;. *Walker*, 852 F.2d at 381; *Sanders*, 875 F.2d at 207.

Schreiber, therefore, has not established that his co-counsel provided deficient performance in this manner or that their performance caused him prejudice. Thus, the state district court was not unreasonable for concluding that Schreiber's co-counsel were not ineffective for deciding not to object to hearsay testimony of Gerlich. Schreiber's § 2254 petition must be denied in respect to this claim.

## D. FAILURE TO QUESTION JUROR JACKSON

On Schreiber's postconviction appeal, the court of appeals reached the merits of Schreiber's ineffective assistance claim with respect to juror Janet Jackson. *Schreiber v. State*, 2004 WL 148513, at *4. The court made these findings: that Jackson's main concern was that Denham, Sr., and Kemp might be witnesses; that the trial court cleared up her concern; and

that the trial court established that she could be fair and impartial despite being nervous. *Id.* In its first step of its analysis—*i.e.,* whether Daily's and Neary's performance was reasonable under prevailing professional standards—the court found "there are many tactical reasons why counsel would have wanted Jackson on the jury." *Id.* The court concluded "[w]here an attorney makes a reasonable strategic decision, even if it is not successful, we will not find the attorney ineffective." *Id.* (quoting *Steinkuehler v. State,* 507 N.W.2d 716, 720 (Iowa 1993)). Evaluating the second step of ineffective assistance analysis—whether Schreiber was prejudiced by his attorneys' failure to probe further into Jackson's concerns about the men in the gallery—the court held that Schreiber was not prejudiced. *Id.*

■ Schreiber notes that the court of appeals did not identify any of the "many tactical reasons" Neary and Daily may have had for wanting Jackson on the jury, and argues that for this reason the decision is an unreasonable application of *Strickland.* Schreiber also has a different interpretation of the record of the in-chambers discussion of Jackson's concerns; he argues that Jackson was not concerned with whether the men were witnesses but was concerned that they would "cause trouble," and "make her nervous," because they had "bothered her." (Tr. at 244–46.) The court of appeals, however, found from the record that Jackson's concern was whether the two men were witnesses. This finding of the state court governs this Court's review unless it is unreasonable. *See Evans v. Rogerson,* 223 F.3d 869, 871

(8th Cir.2000) (a federal court may not substitute its own view of the evidence in favor of a state court's reasonable view of it). Although Jackson did make the statements Schreiber cites, the trial court's main concern was whether she knew a witness, and the court of appeals was not unreasonable in finding that Jackson's concern was that the men were witnesses.

The finding of the court of appeals that Jackson's concern was whether Denham, Sr., and Kemp were witnesses essentially forecloses Schreiber's argument that his attorneys were ineffective for not discovering that Jackson was concerned about being intimidated. Assuming, however, that the court of appeals was unreasonable in finding otherwise, Schreiber's claim would still fail. Schreiber argues that on the basis of Jackson's report to the court, and Denham, Sr.'s later contact with removed alternate juror Davis, his attorneys' performance was unreasonable because they failed to discover that Denham, Sr., was intimidating the jury.[9] Schreiber's claim that Denham, Sr., was intimidating the jury is entirely speculation that is based on the two instances in which his name arose, first in respect to juror Jackson and second in respect to alternate juror Davis. Based on this speculation, Schreiber argues that by failing to pursue this possibility, or the possibility that Jackson discussed her intimidation concerns with other jury members, his attorneys were ineffective.

The circumstances surrounding alternate juror Davis do not support Schreiber's speculation. The record of the court's in-chambers examination of Davis shows that Denham, Sr., did contact her after the

---

9. Respondent points out that Schreiber cites *Smith v. Phillips,* 455 U.S. 209, 215, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), a juror partiality case, for the proposition that Schreiber is entitled to a hearing on Jackson's partiality. Respondent is correct, however, that Schreib-

er presented his claim regarding Jackson as a juror misconduct claim in state court. Therefore, couched as a juror partiality claim, Schreiber's claim is unexhausted. *See Reagan v. Norris,* 279 F.3d 651, 656 (8th Cir. 2002).

jury was empaneled to ask what she thought of his son's performance as a witness. (Tr. at 322–23.) Davis was removed as an alternate juror due to this conversation. She was not removed, however, because Denham, Sr., intimidated or influenced her. She was removed because she told Denham, Sr., that she thought Schreiber was guilty (Tr. at 322), which showed she improperly formed an opinion on guilt or innocence before the conclusion of the evidence.

Moreover, the transcript of the court's examination of Jackson does not show she was intimidated to the extent that could have prejudiced Schreiber. After Jackson repeatedly failed to answer directly the court's question whether she could serve as a juror despite Denham, Sr., and Kemp being in the gallery, the trial court made a point of getting her to answer this question: "[e]ven though you may be nervous, you can still serve and be fair and impartial?" (Tr. at 246.) Jackson answered "yes." If Jackson were intimidated by Denham, Sr., to the extent Schreiber alleges, the trial court gave her every opportunity to say so. Neither of Schreiber's co-counsel felt Jackson's nervousness was important enough to pursue, and this was not deficient performance.

For the reasons articulated above, neither Daily nor Neary provided representation falling below reasonable professional standards, and, to the extent discussed above, Schreiber was not prejudiced by any allegedly deficient performance. Schreiber's § 2254 petition in respect to these claims must be denied.

## E. GENERAL FAILURE TO ESTABLISH PREJUDICE

The second step of ineffective assistance analysis, as noted above, is to determine whether Schreiber's co-counsel's alleged errors caused him actual prejudice. To meet this standard, there must be "probability sufficient to undermine confidence in the outcome" of the trial and direct appeal. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. The court of appeals noted that it had determined on direct review that the evidence at trial in favor of Schreiber's guilt was "overwhelming." *Schreiber v. State*, 2004 WL 148513, at *4. After an exhaustive review the record, the Court concludes that the court of appeals was not unreasonable in reaching this conclusion.

Schreiber's main argument is that the evidence against him was entirely circumstantial. While that was essentially true, the amount and character of the circumstantial evidence against him was considerable. As a general matter, had Schreiber's attorneys provided ineffective assistance in respect to each of Schreiber's claims,[10] the resulting prejudice would not be enough to undermine confidence in the outcome. Multiple witnesses testified to Schreiber's and Tangie's suspicious actions leading up to Terry's murder. Denham testified to Tangie and Schreiber's plan to get Terry drunk and drop him off in Des Moines. Many people also testified to Schreiber, Tangie, and Terry leaving together. Gerlich and Tobie Tangie testified that Schreiber and Tangie returned without Terry. Cemeron Babcock testified that he saw a pick handle in Schreiber's car.

Arguably the most incriminating pieces of evidence, however, were Schreiber's statements after Terry was murdered. Unprompted, he told police that Terry stumbled away from Gerlich's house drunk. Police later established Schreiber

---

10. Respondent notes that Schreiber did not preserve a "cumulative impact" claim in state court. The Court only addresses hypothetical prejudice, however, since Schreiber's co-counsel did not provide ineffective assistance.

and Tangie left with Terry. Schreiber told police he thought Gerlich and Tangie were covering for him. He told Brown that he beat up Tangie's boyfriend and that her boyfriend would not be hurting anyone anymore. Schreiber told investigators that he wanted Tangie to be his girlfriend but that she could not get away from Terry. He also tried to lead investigators astray by telling them a person in Ottumwa was bragging about murdering Terry, but he could not recall who told him. When he was arrested he said, "I guess Evelyn told you." Finally, he told Tony Bone about beating someone with an ax handle. These are only the highlights of the evidence, and although they are circumstantial, when viewed as a whole, a reasonable conclusion is that Schreiber murdered Terry. For this reason, Schreiber has not established prejudice, and his ineffective assistance claims in his § 2254 petition must be denied.

## IV. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Schreiber asserts that his appellate counsel was ineffective for failing to assert each of the claims noted and evaluated above. Because none of the claims had merit, Schreiber's appellate attorney was not ineffective for failing to bring them. *See Clark v. Groose*, 16 F.3d 960, 963 (8th Cir.1994) (holding that an attorney is not ineffective for failing to make a meritless objection).

### CONCLUSION

For the reasons detailed above, Schreiber's § 2254 petition for a writ of habeas corpus must be **denied**. The case is **dismissed**.

**IT IS SO ORDERED.**